UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

In re:                                                          Case No. 08-22796

GREAT LAKES TISSUE COMPANY,                                     Chapter 11

    Debtor.                                              Hon. Daniel S. Opperman
_____/
ALL POINTS CAPITAL CORPORATION,

    Plaintiff,

v.                                                              Adv. Proc. No. 09-2007

CITY OF CHEBOYGAN, et al.,

    Defendant.
_____/

OPINION REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT
FILED BY PLAINTIFF ALL POINTS CAPITAL CORPORATION
AND DEFENDANT CITY OF CHEBOYGAN

Introduction

This is a lien priority dispute in which Plaintiff All Points Capital Corporation ("All Points") and Defendant City of Cheboygan ("Cheboygan") have filed cross-motions for summary judgment, both arguing that there is no genuine issue of material fact. The collateral at issue consists of certain specified machinery and equipment ("Disputed Collateral"). Following the Debtor's Chapter 11 bankruptcy filing on September 22, 2008, this lien priority dispute was originally brought before the Court upon All Points' motion for adequate protection, to which both the Debtor and Cheboygan objected, asserting that Cheboygan holds the first priority lien with respect to the Disputed Collateral. An adversary proceeding was then commenced by the

1

conversion of the Motion for Adequate Protection into the instant adversary proceeding, in which all other entities which asserted an interest in the Disputed Collateral were named as Defendants by Plaintiff All Points. After discovery, pre-trial motions and stipulations, there is now only a dispute between All Points and Cheboygan. Both parties agree that the Debtor's interest in the Disputed Collateral is possessory only.

Specifically, the parties dispute that All Points is entitled to rely upon and benefit from the assignment provisions of a second subordination agreement between Cheboygan and RCA, a lender to the Debtor, which thereafter assigned its interests under the subordination agreement to All Points ("Second Subordination Agreement"). Cheboygan argues that the Second Subordination Agreement was not assignable, and if it was, that it was not properly assigned to All Points. Thus, Cheboygan argues it is entitled to a priority position under the Second Subordination Agreement.

Both All Points and Cheboygan agree to the following facts, as evidenced by a Stipulation between them filed on October 30, 2009, at Docket No. 57. Given the specifics of each stipulation and the care given by the parties to draft each stipulation, the Court incorporates certain numbered paragraphs of the stipulation into this Opinion as follows:

## UNDISPUTED FACTS

### I. THE CHEBOYGAN LOAN DOCUMENTS

**A.      The 1993 Cheboygan Loan**

21.     On September 17, 1993, Cheboygan, the State of Michigan Department of Commerce (the "State") and the United States Department of Housing and Urban Development ("HUD") entered into a *Contract for Loan Guaranty Assistance under Section 108 of the*

2

*Housing and Community Development Act of 1974, as amended* (the "Section 108 Contract") with Cheboygan, whereby the State, with HUD's approval, funded a loan from Cheboygan to the Debtor in the principal amount of $3,000,000.00 to finance the Debtor's acquisition of certain land, equipment and buildings located at 437 South Main Street, Cheboygan, MI 48721 (the "Facility") from the Procter and Gamble Paper Products Company and for working capital.

22. On September 17, 1993, Cheboygan and the Debtor also entered into a *Term Loan Agreement* (the "Cheboygan Loan Agreement"), whereby Cheboygan agreed to make the economic development loan to the Debtor in the original principal amount of $3,000,000.00 as provided in the Section 108 Contract.

23. On September 17, 1993, the Debtor also executed a *Promissory Note* (the "1993 Cheboygan Note") in favor of Cheboygan in the amount of $3,000,000.00, plus interest at the same rate or rates applicable to the notes (including interim notes) issued by Cheboygan and guaranteed by HUD under the Section 108 Contract. Repayment of the 1993 Cheboygan Note was guaranteed by HUD pursuant to the Section 108 Contract.

24. To secure the Debtor's payment obligations under the 1993 Cheboygan Note, on September 17, 1993, the Debtor and Cheboygan entered into a certain *Security Agreement* (the "1993 Cheboygan Security Agreement"), wherein the Debtor granted Cheboygan a security interest in all the Debtor's machinery and equipment, whether then owned or subsequently acquired, as collateral to secure the Debtor's obligations to Cheboygan

25. In addition to granting Cheboygan security interests and liens as provided in the 1993 Cheboygan Security Agreement, on September 16, 1993, the Debtor also executed a mortgage in favor of Cheboygan against certain real property, including, but not limited to, the

3

Facility (the "<u>Mortgage</u>").

26.     On or about September 16, 1993, Cheboygan assigned its interest in the 1993 Loan Documents to HUD to secure HUD's guaranty as required by the Section 108 Contract (the "<u>HUD Assignment</u>").  The Cheboygan Loan Agreement, 1993 Cheboygan Note, 1993 Cheboygan Security Agreement, Mortgage and HUD Assignment are collectively referred to as the "<u>1993 Loan Documents</u>."  Cheboygan's 1993 transaction with the Debtor together with all subsequent related loan amendments, security agreements, UCC-1 Financing Statements, and modifications including those more fully described below are collectively referred to as the "<u>Cheboygan Loan</u>."  At this time, Cheboygan became "lender and secured party of record" for the Cheboygan Loan.

**B.      The Cheboygan Loan Amendment**

27.     From time to time, the Cheboygan Loan was amended or modified.  In 1999, Cheboygan entered into one such amendment to the Cheboygan Loan Agreement and a new Security Agreement was also executed, whereby the Debtor provided Cheboygan a blanket security interest in all personal property of the Debtor (the "<u>1999 Security Agreement</u>").  (The Collateral described in the 1999 Security Agreement is referred to as the "<u>Cheboygan Collateral</u>").

28.     In late 2004, the Debtor executed another *Amended Loan Agreement* with Cheboygan, wherein the Debtor reaffirmed its indebtedness to Cheboygan in the amount of $2,812,961.05 (the "<u>2004 Cheboygan Amendment</u>").

29.     On December 30, 2004, the Debtor executed an *Amended Promissory Note* in

4

favor of Cheboygan in the amount of $2,812,961.05. [1]

30.     At or around the time the 2004 Cheboygan Amendment was executed, the State retired the HUD bonds which, together with the HUD's guaranty and any assignment to HUD as security for its guaranty, were no longer part of the Cheboygan Loan.

31.     On or about December 16, 2004, Cheboygan filed a UCC-1 Financing Statement with the Michigan Secretary of State, thereby properly perfecting its lien and security interest in the Cheboygan Collateral.

## II.  THE ALL POINTS LOANS

### A.     The Non-Recourse Program Agreement

32.     On or about December 15, 2000, RCA Capital Corporation ("RCA") and All Points entered into a certain Non-Recourse Program Agreement (the "Non-Recourse Agreement").  Pursuant to the terms of the Non-Recourse Agreement, All Points agreed, from time to time, to lend money to RCA on a non-recourse basis, with such loans by All Points to RCA to be memorialized by non-recourse promissory notes executed by RCA in favor of All Points.  RCA's obligations to All Points under each non-recourse promissory note were to be secured by a collateral assignment of rights and remedies granted in RCA's favor by RCA's borrowers and lessors under certain "Contract Documents".

33.     The term "Contract Documents" is defined in the Introduction of the Non-

---

[1] The Debtor's obligations under the Cheboygan Loan, as ameded by the 2004 Cheboygan Amendment, were guaranteed by Clarence Roznowski, Kent Hogan, Cheboygan Hydro Services, LLC, U.S. Tissue Converting, Inc., Cheboygan Warehouse Services, LLC, and Roze Enterprises, LLC.

5

Recourse Agreement as follows:

> In its ordinary course of business, [RCA] enters into leases, lease schedules, equipment finance agreements, chattel mortgages, security agreements and notes (individually and collectively "Contracts") as well as certain other documents and agreements (including without limitation, consents, waivers, guarantees, financing statements, certificates of authority, vendor agreements, amendments and additional collateral agreements ) relating thereto (together with the Contracts such documents and agreements hereinafter referred to as the "<u>Contract Documents</u>") with lessees, debtors, borrowers, guarantors and obligors (each a "Debtor") identified in such <u>Contract Documents</u>. Each Contract relates to a lease or financing of new or used equipment, machinery, vehicles, assets or goods for commercial, industrial or other business use ("Equipment") as may be identified and described in the Contract Documents.

**B.      RCA's 2004 Loan to the Debtor (The 8076 and 8091 Loans)**

34.      On or about December 6, 2004, the RCA loaned the Debtor $1,912,011.00 (the "<u>2004 Loan</u>"). In consideration for RCA's loan, the Debtor executed two promissory notes in RCA's favor: (i) the first note was made in the principal amount of $1,412,011.00 (the "<u>8076 Note</u>") and (ii) the second note in the principal amount of $500,000.00 (the "<u>8091 Note</u>").

35.      On December 6, 2004, the Debtor entered into two Security Agreements with RCA. First, to secure repayment of the Debtor's obligations under the 8076 Note, the Debtor and RCA executed a security agreement (the "<u>8076 Security Agreement</u>") which granted RCA a security interest and lien in certain machinery and equipment (the "<u>8076 Collateral</u>"). Second, to secure repayment of the Debtor's obligations under the 8091 Note, the Debtor and RCA executed a security agreement (the "<u>8091 Security Agreement</u>"), which granted RCA a security interest and lien in certain additional machinery and equipment (the "<u>8091 Collateral</u>").

36.      Based upon the authority granted by the 8076 Security Agreement, on December

8, 2004, RCA perfected its security interest and lien against the 8076 Collateral by filing a UCC-1 Financing Statement with the Michigan Secretary of State (the "8076 UCC-1Statement"). The 8076 Note, 8076 Security Agreement, the 8076 UCC-1 Statement and certain agreements and documents are referred to as the "8076 Loan."

37. Based upon the authority granted by the 8091 Security Agreement, on December 8, 2004, RCA perfected its security interest and lien against the 8091 Collateral by filing a UCC-1 Financing Statement with the Michigan Secretary of State (the "8091 UCC-1 Statement"). The 8091 Note, the 8091 Security Agreement, the 8091 UCC-1 Financing Statement and certain other agreements and documents are referred to as the "8091 Loan."

38. On or about December 22, 2004, RCA funded the 8076 Loan, in part, by transmitting a wire transfer to Guaranty Business Credit ("Guaranty") in the amount of $1,160,000.00 (the "Guaranty Payment") as a partial payoff of a prior loan secured by the Debtor's machinery, equipment and real property. Upon full satisfaction of the Debtor's obligations to Guaranty, Guaranty released its liens against its collateral, including the machinery and equipment that would subsequently be included in the 8076 and 8091 Collateral.

C. **The 2004 Subordination Agreement**

39. At RCA's request and in consideration for RCA's agreement to finance the 8076 and 8091 Loans, on December 29, 2004, Cheboygan and RCA entered into a *Subordination Agreement* (the "First Subordination Agreement"), wherein Cheboygan and RCA agreed to the treatment of their respective security interests and liens in collateral attached as Exhibit A thereto.

D. **RCA's 2005 Assignment to All Points**

7

40. On March 17, 2005, RCA executed a *Non-Recourse Promissory Note* (the "First All Points Note") in favor of All Points pursuant to the terms of the Non-Recourse Agreement. To secure its obligations under the First All Points Note and Non-Recourse Agreement, RCA executed a *Collateral Assignment of Contract Documents* in All Point's favor (the "First Collateral Assignment"), whereby RCA assigned all of its rights and remedies, but not obligations, under the "Contract Documents" to All Points that relate the 8076 Loan (the "8076 Contract Documents")

41. On March 17, 2005, RCA either filed or authorized All Points to file a UCC-4 Financing Statement with the Michigan Secretary of State memorializing the assignment of RCA's security interest and lien against the 8076 Collateral to All Points pursuant to the First Collateral Assignment.

42. All Points requested and the Debtor executed a "Debtor's Acknowledgment and Agreement" wherein it acknowledged and agreed that the 8076 Contract Documents, including the Note, had been assigned to All Points, and that all payments and any other sums whatsoever payable under the agreement would be made directly to All Points (the "First Acknowledgment").

43. As set forth in the Sovereign Order, the 8091 Loan and RCA's rights with respect to a certain Black Clawson Poly Re-Claim and Stock Prep System and certain related equipment were sold, transferred or otherwise assigned by RCA to Sovereign in a separate transaction, are not a subject of this Adversary Proceeding and have not been challenged by any of the parties hereto.

**E.    RCA's 2006 Loan to Debtor (The 10058 Loan)**

8

44. In the summer of 2006, the Debtor requested that RCA finance the Debtor's purchase of two (2) PremiAir Technology Yankee drying hoods to be attached to paper machines 8 and 9 and one (1) new PremiAir Technology Dryer (collectively, the "PremiAir Equipment") and for additional financing. The purpose of the 10058 Loan was to finance the purchase of the PremiAir Equipment, to payoff the 8076 Note and for other business purposes.

45. On August 15, 2006, the Debtor and RCA entered into an agreement referred to as "Contract No. AD-10058", whereby the Debtor executed an *Installment Promissory Note* in the original principal amount of $2,600,000.00 (the "10058 Note") in favor of RCA.

46. Pursuant to the terms of the 10058 Note, the Debtor agreed to pay RCA the sum of $2,600,000.00 in eighty-four (84) successive monthly installments, the first two (2) monthly installments being in the amount of $23,755.00, and the subsequent eighty-two (82) regular monthly installments in the amount of $41,862.00.

47. On August 15, 2006, the Debtor also executed a *Security Agreement* (the "10058 Security Agreement"), wherein the Debtor granted RCA a lien and security interest in certain specified equipment listed on Schedule A thereto, together with all parts, attachments, accessions, additions and replacements to secure repayment of the 10058 Note (the "10058 Collateral").

48. The 10058 Collateral is comprised of the same machinery and equipment that comprise the 8076 Collateral, except that the 10058 Security Agreement also granted RCA a lien against the PremiAir Equipment**.**

49. Based upon the authority granted in the 10058 Security Agreement, on August 23,

9

2006, RCA perfected its security interest and lien against the 10058 Collateral by filing a UCC-1 Financing Statement with the Michigan Secretary of State (the "10058 UCC-1 Financing Statement").

**F.     The Modification Agreement between RCA and Debtor**

50.     On November 4, 2006, the Debtor executed a *Modification Agreement* (the "Modification Agreement").  The Modification Agreement was subsequently executed by the personal guarantors, Clarence Roznowski and Kent Hogan on December 4, 2006.  The Modification Agreement was acknowledged and agreed to in writing by RCA at a later date.

51.     Pursuant to the Modification Agreement, RCA agreed to reduce the Debtor's interest rate under the 10058 Note from 10.2% per annum to 6.7% per annum and modified the payment terms under the 10058 Note to provide that the Debtor would make its remaining eighty-one (81) consecutive monthly payments in the amount of $39,883.00, as compared to eighty-one (81) consecutive monthly payments of $41,862.00 as shown on the 10058 Note.

**G.     The 2006 Subordination Agreement**

52.     By letter dated November 29, 2006, (the "November 29, 2006 Letter"), the State forwarded to Cheboygan a request from RCA that Cheboygan in its role as "lender and secured party of record" sign a subordination agreement as consideration for RCA providing new financing to the Debtor and requesting that Cheboygan sign the attached documents.

53.     At RCA's request and in consideration for RCA's agreement to finance the 10058 Loan and enter into the Modification Agreement with the Debtor, Cheboygan entered into a *Subordination Agreement* with RCA (the "Second Subordination Agreement"), whereby Cheboygan and RCA agreed to the treatment of their respective security interests and liens in the

collateral attached as Exhibit A thereto. The Second Subordination Agreement was executed by Cheboygan on November 26, 2006 and by RCA on December 4, 2006.

### H. RCA's Second Assignment to All Points

54. On December 11, 2006, RCA executed a second *Non-Recourse Promissory Note* (the "Second All Points Note") in favor of All Points in the principal amount of $2,504,810.86. RCA was required to pay All Points $39,883.00 for eighty (80) consecutive months.

55. To secure RCA's obligations under the Second All Points Note, on December 11, 2006, RCA executed a *Collateral Assignment of Contract Documents* (the "Second Collateral Assignment"), whereby RCA assigned its rights and remedies, but not obligations, under the "Contract Documents" to All Points related to the 10058 Loan (the "10058 Contract Documents").

56. On December 7, 2006, RCA filed or authorized All Points to file a UCC-4 Financing Statement with the Michigan Secretary of State memorializing the assignment of RCA's security interest and lien against the 10058 Collateral to All Points pursuant to the Second Collateral Assignment.

57. All Points requested and the Debtor signed a "Debtor's Acknowledgment and Agreement" wherein it acknowledged and agreed that the 10058 Contract Documents, including the 10058 Note, had been assigned to All Points and that all payments and any other sums whatsoever payable under the agreement would be made directly to All Points (the "Second Acknowledgment").

### III. ADDITIONAL STIPULATIONS AND ADMISSIONS

11

Cheboygan and All Points each also make assertions of fact that the other cannot specifically agree to, but which are not contested for purposes of this motion. These assertions are stated as follows:

A.  **Notice and Consent**

58. Cheboygan represents and alleges that RCA did not provide Cheboygan with any notice that it intended to assign RCA's rights and remedies but not its obligations under the 8076 Contract Documents (including RCA's rights under the First Subordination Agreement) to All Points. All Points stipulates and agrees that it did not notify Cheboygan that RCA intended to assign its rights and remedies but not its obligations under the 8076 Contract Documents (including RCA's rights under the First Subordination Agreement) to All Points. All Points also has no records or evidence that would allow All Points to refute Cheboygan's allegation that RCA did not provide notice to Cheboygan of RCA's assignment of its rights and remedies, but not obligations, under the 8076 Contract Documents (including RCA's rights under the First Subordination Agreement).

59. Cheboygan represents and alleges that RCA did not provide Cheboygan with any notice that it intended to assign RCA's rights and remedies, but not its obligations, under the 10058 Contract Documents (including RCA's rights under the Second Subordination Agreement) to All Points. All Points stipulates and agrees that it did not notify Cheboygan that RCA intended to assign its rights and remedies, but not its obligations, under the 10058 Contract Documents (including RCA's rights under the Second Subordination Agreement) to All Points. All Points also has no records or evidence that would allow All Points to refute Cheboygan's allegation that RCA did not provide notice to Cheboygan of RCA's assignment of its rights and

12

remedies, but not its obligations, under the 10058 Contract Documents (including RCA's rights under the Second Subordination Agreement).

60. Cheboygan also represents and alleges that it did not consent to RCA's assignment of the First or Second Subordination Agreements or the rights granted by Cheboygan to RCA thereunder. All Points has no records or documents that would allow All Points to refute Cheboygan's allegation that RCA did not solicit and/or receive Cheboygan's consent to RCA's assignment of the First and/or Second Subordination Agreements or any of RCA's rights thereunder.

**B.     The Cheboygan and All Points Claims**

61. On December 22, 2008, Cheboygan filed a Proof of Claim with its security and perfection documents attached and, as set forth therein, Cheboygan holds a valid claim in the amount of not less than $3,104,393.30 (the "Cheboygan Claim") against the Debtor's estate secured by a valid and properly perfected security interest and lien against all of the Debtor's property. (Claims Registry #59).

62. All Points does not dispute the amount or validity of the Cheboygan Claim nor does All Points dispute that Cheboygan currently holds a valid and properly perfected security interest and lien in the Cheboygan Collateral.

63. On February 3, 2009, All Points filed a Proof of Claim with its security and perfection documents attached and, as set forth therein, All Points holds a valid claim in the amount of not less than $2,825,968.00 (the "All Points Claim") against the Debtor's estate, secured by a valid and properly perfected security interest and lien in all the machinery and equipment identified on Equipment Schedule A of the Second Subordination Agreement and in

13

the 10058 UCC-1 Financing Statement. (Claims Registry #73-1).

64. Cheboygan does not dispute the amount or validity of the All Points Claim.

65. Cheboygan does not dispute that All Points currently holds a valid and properly perfected security interest and lien in the 10058 Collateral.

66. Cheboygan does not dispute that RCA had a valid and properly perfected lien and security interest in the 8076 Collateral.

After the conclusion of the hearing on the cross-motions for summary judgment, the Court requested briefing and further development of facts as to who drafted the Second Subordination Agreement for purposes of construing it. Both All Points and Cheboygan filed briefs and engaged in further discovery to get to the bottom of this inquiry. The end result of this effort is that, although the parties cannot determine with absolute certainty that one side or the other can be characterized as the drafter of the Second Subordination Agreement, they do agree that it was a negotiated document to some degree.

The Court has reviewed all pleadings in this matter, and for the reasons stated below, denies both cross-motions for summary judgment as issues of fact exist as to the validity of the Second Subordination Agreement, as well as the meaning and effect of such.

## Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(K) (determinations of the validity, extent, or priority of liens). Both All Points and Cheboygan consent to the Court's exercise of jurisdiction of this adversary proceeding.

## Summary Judgment Standard

Federal Rule of Civil Procedure 56 is made applicable in its entirety to bankruptcy adversary proceedings by Fed. R. Bankr. P. 7056. Federal Rule of Bankruptcy Procedure 7056(c) provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Choate v. Landis Tool Co.*, 46 F. Supp. 774 (E.D. Mich. 1980). The moving party bears the burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The burden then shifts to the nonmoving party once the moving party has met its burden, and the nonmoving party must then establish that a genuine issue of material fact does indeed exist. *Janda v. Riley-Meggs Industries, Inc.*, 764 F. Supp 1223, 1227 (E.D. Mich. 1991).

As summarized by *St. Paul Fire & Marine Ins. Co. v. CEI Florida, Inc.,* 864 F. Supp. 656 (E.D. Mich. 1994), the Sixth Circuit has promulgated a "series of principles to be applied in motions for summary judgment:

> Cases involving state of mind issues are not necessarily inappropriate for summary judgment.
>
> The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element as to a non-movant's case.
>
> This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.
>
> The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported

15

motion for summary judgment."

> The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.
>
> The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

*Id at* 664-65 (E.D. Mich. 1994) (citing *J.C. Bradford & Co.*, 886 F.2d at 1479-80 (footnotes with citations omitted)).

## Cross-Motions for Summary Judgment

In cases in which the parties have filed cross-motions for summary judgment, the court must consider each motion separately on its merits, since each party, as a movant for summary judgment, bears the burden to establish both the nonexistence of genuine issues of material fact and that party's entitlement to judgment as a matter of law. *Lansing Dairy v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994); *Markowitz v. Campbell* (*In re Markowitz*), 190 F.3d 455, 463 n.6 (6th Cir. 1999). That both parties simultaneously argue there are no genuine issues of material fact does not in itself establish that a trial is not necessary, and that one party has failed to sustain its burden under Federal Rule of Civil Procedure 56 does not automatically entitle the opposing party to summary judgment. *See* 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure: Civil 3d* § 2720 (1998).

## Analysis

While the Court recognizes and appreciates both All Points' and Cheboygan's effort in preparing stipulated facts and briefs regarding these cross-motions for summary judgment, the Court concludes that issues of fact remain regarding the following major issues in this dispute. First, as a preliminary matter, the Court will examine the meaning and effect of the circumstances surrounding the drafting of the Second Subordination Agreement. The Court notes that pursuant to Paragraph 7 of this agreement, it is "governed by and construed as to each item of Equipment in accordance with the laws of the State of New Jersey," and will, accordingly, refer to and rely upon New Jersey law when analyzing it.

A . Drafter of the Second Subordination Agreement

In analyzing the Second Subordination Agreement, it became relevant to the Court who the drafter of it was–RCA, as assignor to All Points, or Cheboygan. The Court notes that as a general rule of contract construction, an agreement, such as the Second Subordination Agreement, is to be construed against the drafter. *See Pacifico v. Pacifico*, 190 N.J. 258, 267, 920 A.2d 73 (2007) (citing 5 *Corbin on Contracts* § 24.27 (Perillo ed., rev. ed. 1998)); *Wilkie v. Auto-Owners Ins. Co.,* 469 Mich. 41, 60, 664 N.W.2d 776, 786-87 (2003). The post-hearing briefs and exhibits addressing this issue argue first that the Second Subordination Agreement is unambiguous and, thus, the identity of the drafter is irrelevant; and, second, because the agreement was the product of extensive negotiations between RCA and Cheboygan, the doctrine of *contra proferentem*, or the rule of construing the contract term against the drafter, is inapplicable.

The Court has analyzed documents submitted by the parties leading up to execution of the Second Subordination Agreement between RCA and Cheboygan. Notably, the affidavit of

17

Hans Larson, as well as the transcript of his April 8, 2010, deposition were submitted to the Court, presumably to demonstrate that it is not clear who drafted the Second Subordination Agreement, but that such was the result of negotiations between RCA and Cheboygan. Cheboygan asserts that the involvement of it, through the entity of the Michigan Economic Development Corporation, was limited to supplying lending formulas to RCA for utilization in the agreement. Thus, it is Cheboygan's position that it should not be considered the drafter of it, but, rather, RCA was. This assertion raises more doubt than clarity in the Court's view, and this doubt only strengthens the case against summary judgment. The facts of this case must be distinguished from the cases, such as the insurance contract at issue in *Pacifico*, in which the agreement is one-sided to the point that the extent of the insured's participation is merely reviewing and signing it.

The Court thus concludes that, at a minimum, a genuine issue of material fact exists as to who drafted the Second Subordination Agreement, rendering the effect of such meaningless for purposes of these cross-motions for summary judgment. A second issue of material fact exists as to whether the Second Subordination Agreement was the product of extensive negotiations between the parties, which again renders the effect of same meaningless for summary judgment purposes.

B.  <u>Meaning and Effect of Second Subordination Agreement</u>

What the Court also cannot conclude as a matter of law is that the Second Subordination Agreement precluded RCA from assigning its rights and obligations to All Points. The Court begins its analysis keeping in mind that, absent an express prohibition on assignment, rights may generally be assigned in the absence of a public policy reason to the contrary. *See Aronsohn v.*

18

*Mandara*, 98 N.J. 92, 484 A.2d 675, 679 (1984) (citing 4 *Corbin on Contracts* § 857, at 410; § 872, at 485-86; § 873, at 494 (1951)). The Court is in effect being asked to go beyond the four corners of the Second Subordination Agreement to make this determination and to read or not read into this agreement a provision that is not or should be there. Both sides strenuously argue that the Court should find the Second Subordination Agreement unambiguous and find in favor or their respective interpretation. Based upon the record before the Court, there has been enough doubt shed upon each interpretation so that the Court finds summary judgment inappropriate at this stage in the proceedings.

Specifically, both All Points and Cheboygan present different versions of their understanding regarding the ability of RCA to assign its rights under either subordination agreement. On one hand, while Cheboygan disputes the validity of the assignment of the First Subordination Agreement, it appears to the Court that Cheboygan became aware of the assignment from RCA to All Points when the Second Subordination Agreement was executed. At a minimum, this is an issue of fact that weighs in favor of All Points. This would support a finding that the Second Subordination Agreement was validly assigned to All Points. On the other hand, Cheboygan asserts that the Second Subordination Agreement was not validly assigned to All Points because RCA did not have the authority to do so. This is, again, an issue of fact that, if proven true, would support Cheboygan's position.

C. Validity of Second Subordination Agreement

Issues of fact exist as to whether RCA assigned both the rights and obligations under the Second Collateral Assignment to All Points. If only the rights were assigned, the validity of the assignment from RCA to All Points is questionable. Before the Court can address this issue,

19

however, the Court must determine the obligations, if any, assigned to All Points and whether All Points complied with its obligation, if any, as assigned by the Second Subordination Agreement.

D. <u>All Point's Compliance with Terms of Second Subordination Agreement</u>

Even if the Second Subordination Agreement is held to have effectively assigned RCA's rights and obligations to All Points, issues of fact exist as to Cheboygan's assertion that All Points has failed to comply with the terms of the agreement, as well as whether All Points holds a purchase money security interest in the PremiAir Equipment and possibly additional property.

Conclusion

Based upon the record before the Court, All Points' and Cheboygan's cross-motions for summary judgment are denied. For the above-stated reasons, neither All Points, or Cheboygan has met its burden of demonstrating the absence of genuine issues of fact regarding All Points' rights/obligations, and resulting lien priority, pursuant to the Second Subordination Agreement. The issues outlined by the Court as A through D must be examined, and ultimately, decided in the context of an evidentiary hearing.

The Court will issue an appropriate order, which will also set a telephonic scheduling conference in this matter.

**Signed on July 01, 2010**

                                              **/s/ Daniel S. Opperman**
                                    **Daniel S. Opperman**
                                    **United States Bankruptcy Judge**