UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

In re:                                          Case No. 08-22796

GREAT LAKES TISSUE COMPANY,                     Chapter 11

    Debtor.                                     Hon. Daniel S. Opperman
_____/
ALL POINTS CAPITAL CORPORATION,

    Plaintiff,

v.                                              Adv. Proc. No. 09-2007

CITY OF CHEBOYGAN, et al.,

    Defendant.
_____/


OPINION REGARDING LIEN PRIORITY DISPUTE BETWEEN PLAINTIFF ALL POINTS
CAPITAL CORPORATION AND DEFENDANT CITY OF CHEBOYGAN

Introduction

    This case involves a lien priority dispute between Plaintiff All Points Capital Corporation

("All Points") and Defendant City of Cheboygan ("Cheboygan").  Both sides  filed cross-

motions for summary judgment, which the Court denied via its Opinion and Order dated July 1,

2010.  A summary of this dispute is succinctly stated in the Court's July 1, 2010, Opinion, and

bears repeating here.

    The collateral at issue consists of certain specified machinery and equipment ("Disputed

Collateral").  Following the Debtor's Chapter 11 bankruptcy filing on September 22, 2008, this

lien priority dispute was originally brought before the Court upon All Points' motion for

adequate protection, to which both the Debtor and Cheboygan objected, asserting that

1

Cheboygan holds the first priority lien with respect to the Disputed Collateral. An adversary proceeding was thereafter commenced by the conversion of the Motion for Adequate Protection into the instant adversary proceeding, in which all other entities which may assert an interest in the Disputed Collateral were named as Defendants by Plaintiff All Points. Pursuant to the March 10, 2009, Order in effect streamlining the procedures for answering the adversary complaint, the end result was that the priority determination regarding the Disputed Collateral remains between All Points and Cheboygan only, both agreeing that the Debtor's interest in the Disputed Collateral is possessory only.

Specifically, the parties dispute that All Points is entitled to rely upon and benefit from the assignment provisions of a second subordination agreement between Cheboygan and RCA, a lender to the Debtor, which thereafter assigned its interests under the subordination agreement to All Points ("Second Subordination Agreement"). Cheboygan argues that the Second Subordination Agreement was not assignable, and if it was, that it was not properly assigned to All Points. Thus, Cheboygan argues it is entitled to a priority position under the Second Subordination Agreement.

Both All Points and Cheboygan agree to certain facts, as evidenced by a Stipulation between them filed on October 30, 2009, at Docket No. 57 ("First Stipulation"), which this Court incorporated into its July 1, 2010, Opinion and continues to incorporate in the instant Opinion. On November 18, 2010, at Docket No. 83, the parties filed a Supplemental Stipulation of Facts and Issues ("Supplemental Stipulation"), which the parties state "is intended to be a continuation

of" the First Stipulation, and which this Court incorporates into this Opinion.[1]  The Supplemental

Stipulation states as follows:

1.      All Points and Cheboygan agree that the facts set forth in this

Supplemental Stipulation are, to the best of their knowledge, true and accurate

and that the Exhibits annexed thereto are true and accurate copies of the original

documents that are in their possession and control.

2.      All Points and Cheboygan also stipulate and agree that they may

both rely upon this Supplemental Stipulation and the First Stipulation and the

Exhibits attached thereto to support any motions or proceedings related to the

transactions and occurrences described therein.

A.      **The July 1, 2010 Opinion and Order**

3.      On July 1, 2010, the Court entered an Opinion Regarding Cross-

Motions For Summary Judgment Filed by Plaintiff All Points Capital Corporation

And Defendant City of Cheboygan (the "Opinion") [Doc. No. 79] and the Order

Regarding Cross-Motions For Summary Judgment by Plaintiff All Points Capital

Corporation and Defendant City of Cheboygan (the "Order") [Doc. No. 80]

denying All Points and Cheboygan's respective motions for summary judgments.

4.      The Court, however, made certain findings of undisputed fact as

set forth in pages 2 through 14 of the Opinion, which essentially memorialize and

---

[1]      The Court has deleted references to certain Exhibits and other documents to avoid
confusion.

incorporate the stipulations of undisputed facts set forth in the First Stipulation.

5.      The Court also identified questions of fact that it could not resolve under Fed.R.Civ.P. 56 as set forth in pages 14 through 20 of the Opinion.

6.      The Court has held regular conferences in this adversary proceeding, during which the Court suggested and the parties have agreed to provide this Supplemental Stipulation wherein they would set forth additional undisputed facts.

7.      All Points and Cheboygan have prepared this Supplemental Stipulation for the purpose of providing the Court with undisputed facts to allow the Court to reconsider its July 1, 2010 Decision.

**B.      Additional Documents to be Considered as Evidence by the Court**

8.      On or about October 30, 2009, Cheboygan submitted an Affidavit of Nancy Eddy to the Court as an exhibit to its Motion for Summary Judgment (the "Eddy Affidavit").

9.      On or about October 30, 2009, Cheboygan submitted an Affidavit of Scott McNeil to the Court as an exhibit to its Motion for Summary Judgment (the "McNeil Affidavit").

10.     On or about March 3, 2010, Cheboygan submitted an Affidavit of Hans Larsen ("Larsen") to the Court (the "Larsen Affidavit").

11.     On April 8, 2010, Larsen appeared for a deposition in this adversary proceeding.  Larsen has been a loan officer for the State of Michigan for over twenty (20) years.  Larsen was personally involved with the drafting and

execution of both the First and Second Subordination Agreements and has been personally involved with the loans made by the City of Cheboygan to the Debtor since the year 2000. Larsen was also personally involved in the day-to-day administration of the Cheboygan Loan (including the events surrounding the Subordination Agreements) during all time periods at issue in the dispute between Cheboygan and All Points.

12.     On or about July 14, 2009 and September 11, 2009, Catherine Wilinski ("Wilinski") appeared for a deposition in this adversary proceeding. Wilinski was not personally involved with the drafting or execution of either the First or Second Subordination Agreements and only became personally involved with the 10058 Loan sometime between July and November 2007.

13.     Neither All Points nor Cheboygan have been able to locate and/or successfully subpoena any witnesses, other than Larsen, that were personally involved in the drafting and execution of the First and Second Subordination Agreements. To the extent such witnesses exist, they are, upon information and belief, former employees of RCA Capital Corporation, a non-party to this case and, upon information and belief, residents and dominciliaries of New Jersey and/or New York.

C.     **Drafter of the Subordination Agreements**

14.     By way of background, two individuals were principally involved in the discussions regarding the First Subordination Agreement.

15.     Larsen, a loan officer for the MEDC, represented the interests of

5

the MEDC, the Michigan Strategic Fund ("MSF") and Cheboygan. Larsen is still employed as a loan officer for the MEDC and the MSF.

16.     Stephen J. Cubellis ("Cubellis"), who was a vice-president for RCA Capital Corporation ("RCA"), was the "point person" for RCA in the negotiations regarding the First and Second Subordination Agreements.

17.     In early December 2004, RCA asked Cheboygan to subordinate its security interest and liens in certain equipment collateral in favor of RCA in consideration for RCA's agreement to extend $1,912,011.00 in secured financing to the Debtor.

18.     On or about December 14, 2004, Cubellis prepared an initial draft of a proposed Subordination Agreement using RCA's standard subordination agreement (the "First Draft"), which he emailed to Larsen that same day.

19.     The First Draft provides in relevant part:

1.     In order to induce RCA to make extensions of credit to Borrower, the repayment of which is to be secured by RCA's Interest in the Equipment, LENDER hereby subordinates the lien of LENDER's security interest to the lien of RCA's Interest (now or hereafter held by RCA) in the Equipment. LENDER will not enforce or exercise its rights in the Equipment and will not ask, demand, sue for, take or receive from Borrower any interest in the Equipment unless and until all obligations of Borrower to RCA now existing or hereafter created, the repayment of which are secured by RCA's Interest in the Equipment, are satisfied in full.

2.     LENDER agrees and acknowledges that RCA, at any time and from time to time, may enter into such agreements with the Borrower as RCA may deem proper which modify or otherwise alter the terms of any of the obligations of the Borrower to RCA and that such modifications or alterations shall not in any way impair or affect the validity or enforceability of this Agreement.

6

3. No waiver shall be deemed to be made by RCA of any of its rights hereunder unless the same shall be in writing signed on behalf of RCA, and each such waiver, if any, shall be a waiver only with respect to the specific matter or matters to which the waiver relates and shall in no way impair the rights of RCA or the obligations of the Borrower to RCA on any other respect at any other time.

4. The subordination by LENDER made in this Subordination Agreement, and the rights and privileges of RCA hereunder, shall continue for so long as RCA has a security interest in the Equipment and until all obligations of Borrower to RCA now existing or incurred hereafter are satisfied in full.

5. This Agreement shall be binding upon and inure to the benefit of LENDER and RCA and their respective heir, executors, administrators, successors and assigns.

6. LENDER agrees to execute any documents necessary to subordinate its security interest in the Equipment to RCA's Interest.

7. **This Agreement shall be governed by and construed as to each item of Equipment in accordance with the laws of the State of New Jersey and the parties hereby submit to the venue and jurisdiction of Bergen County, New Jersey to resolve any disputes arising hereunder or in connection herewith.**

8. Nothing herein shall be deemed in any way to modify the obligations of Borrower either to RCA or LENDER or to limit the rights of RCA as against the Borrower.

20. Larsen and Cubellis exchanged e-mails dated December 14, 2004 and December 20, 2004. This correspondence is memorialized in an e-mail string. As part of this e-mail string, Larsen provided to Cubellis certain lending formula language (the "Lending Formulas") and other language which is identical to paragraphs 22 and 23 of the Amended Loan Agreement.

21. On or about December 15, 2004, Larsen prepared a revised version

7

of the First Draft (the "<u>Larsen Draft</u>").  Larsen testified that he used the First Draft as a template for creating the Larsen Draft by incorporating language from the Amended Loan Agreement between the City and the Debtor and using language found in another  agreement between the MEDC and a subordination agreement generated in a different transaction involving an unrelated senior lender.  During the Larsen Deposition, Larsen could not recall with any degree of certainty whether or not he actually sent the Larsen Draft to Cubellis or whether he only used it to discuss the changes that he was requesting be made to the First Draft with Cubellis.

22.    The Larsen Draft contains additional language that Cheboygan either provided to or discussed with Cubellis as language which could be included in a final subordination agreement and also contains rough language in two unnumbered and unincorporated paragraphs at the end of the document related to other terms and formulas that also might be incorporated into the final Subordination Agreement.

23.    The Larsen Draft differed from the First Draft as follows:

1.    In order to induce RCA to make extensions of credit to Borrower, the repayment of which is to be secured by RCA's Interest in the Equipment, LENDER hereby subordinates the lien of LENDER's security interest to the lien of RCA's Interest (now or hereafter held by RCA) in the Equipment <u>provided that RCA's Interest does not exceed the following RCA Lending Limits: (a) RCA's Loans for the purchase of new or used machinery and equipment shall not exceed the One Hundred percent (100%) of the equipment's cost; and (b) RCA's Loans on existing machinery and equipment shall not exceed One Hundred percent (100%) of the ninety (90) day liquidation value as determined by an MAI appraiser selected by Senior Lender.</u>

8

2.     In the event that RCA's Interest in the Equipment exceeds the RCA Lending Limits, then RCA's Interest shall be subordinate to LENDER's security interest in the Equipment for those amounts that exceed the RCA Lending Limits.

3.     LENDER will not enforce or exercise its rights in the Equipment and will not ask, demand, sue for, take or receive from Borrower any interest in the Equipment unless and until all obligations of Borrower to RCA now existing or hereafter created, the repayment of which are secured by RCA's Interest in the Equipment, are satisfied in full.

4.     LENDER agrees and acknowledges that RCA, at any time and from time to time, may enter into such agreements with the Borrower as RCA may deem proper which modify or otherwise alter the terms of any of the obligations of the Borrower to RCA and that such modifications or alterations shall not in any way impair or affect the validity or enforceability of this Agreement.

5.     No waiver shall be deemed to be made by RCA of any of its rights hereunder unless the same shall be in writing signed on behalf of RCA, and each such waiver, if any shall be a waiver only with respect to the specific matter or matters to which the waiver relates and shall in no way impair the rights of RCA or the obligations of the Borrower to RCA on any other respect at any other time.

6.     The subordination by LENDER made in this Subordination Agreement, and the rights and privileges of RCA hereunder, shall continue for as long as RCA has a security interest in the Equipment and until all obligations of Borrower to RCA now existing or incurred hereafter are satisfied in full.

7.     This Agreement shall be binding upon and inure to the benefit of LENDER and RCA and their respective heir, executors, administrators, successors and assigns.

8.     LENDER agrees to execute any documents necessary to subordinate its security interest in the Equipment to RCA's Interest.

9.     **This Agreement shall be governed by and construed as to each item of Equipment in accordance with the**

9

laws of the State of New Jersey and the parties hereby submit to the venue and jurisdiction of Bergen County, New Jersey to resolve any disputes arising hereunder or in connection herewith.

10.   Nothing herein shall be deemed in any way to modify the obligations of Borrower either to RCA or LENDER or to limit the rights of RCA as against the Borrower.

**LENDER'S SUBORDINATION**. Absent the existence of a Payment Default, upon written notification to Lender, Lender shall execute documents necessary to subordinate its security interest in all real and personal property pledged as collateral under this Agreement to the security interests of Borrower's credit facility provider ("Senior Lender(s)"). Provided, however, the credit facilities provided by Senior Lender to Borrower shall not exceed the following lending limits: (a) Revolving Credit Facility: (i) accounts receivable lending shall not exceed Ninety percent (90%) of Borrower's accounts receivable excluding accounts that exceed Ninety (90) days if recognized as eligible by Senior Lender, and (ii) inventory lending shall not exceed Fifty percent (50%) of Borrower's inventory if recognized as eligible by Senior Lender; (b) Equipment Credit Facility: (i) Senior Lender's loans for the purchase of new or used machinery and equipment shall not exceed the Ninety percent (90%) of the equipment's cost; and (ii) Senior Lender's loans on existing machinery and equipment shall not exceed One Hundred percent (100%) of the "Ninety (90) day liquidation value" as determined by an MAI appraiser selected by Senior Lender; (c) Debt Secured by Real Estate: Senior Lender's loans that are secured by mortgages shall not exceed Ninety percent (90%) of the real property's appraised value.

**ADDITIONAL PROVISION**. Lender and Mortgagee mutually agree that:

1.   Mortgagee will subordinate its interests in the Subordinated Mortgage to Lender's Superior Indebtedness and all other fees or expenses ("Lender Claims") that do not exceed the aggregate total of One Million Seven Hundred Thousand and no/100 Dollars ($1,700,000.00) ("Subordinated Amount"). Lender Claims in excess of the Mortgagee's Subordinated Amount shall be subordinate to any amounts owed to Mortgagee by Borrower in accord with the terms of the Loan Agreement Amendment made the 15th day of February, 2002, between CMCHB, Inc., a Michigan corporation whose address is 120 Lincoln, Ontonagon,

10

Michigan 49953 ("Debtor") and the State of Michigan located at
300 North Washington Square, Lansing, Michigan 48913
("Creditor").

       2.      Mortgagee's rights to payments from Borrower shall
be suspended only after Lender has provided written notice to
Mortgagee that Lender has declared a payment default by
Borrower and has initiated formal foreclosure proceedings in
Michigan against all of the Borrower's real and personal property.

       3.      In the event that there is any conflict between the
terms of this Additional Provision paragraph and the terms in any
other paragraph of this Subordination of Mortgage agreement, then
the terms of this Additional Provision paragraph shall prevail.

       24.     Although it is unclear how many drafts of the First Subordination

Agreement were exchanged by and between RCA and MEDC or whether any

drafts other than the First Draft and the Final Draft (the "Final Draft") were

exchanged, it appears that a Final Draft of the First Subordination Agreement was

prepared by RCA and sent to the MEDC for approval.

       25.     The Final Draft differs from the First Draft as follows:

       1.      In order to induce RCA to make extensions of credit
to Borrower, the repayment of which is to be secured by RCA's
Interest in the Equipment, LENDER hereby subordinates the lien
of LENDER's security interest to the lien of RCA's Interest (now
or hereafter held by RCA) in the Equipment.  LENDER will not
enforce or exercise its rights in the Equipment and will not ask,
demand, sue for, take or receive from Borrower any interest in the
Equipment unless and until all obligations of Borrower to RCA
now existing or hereafter created, the repayment of which are
secured by RCA's Interest in the Equipment, are satisfied in full.

       2.      LENDER agrees and acknowledges that RCA, at
any time and from time to time, may enter into such agreements
with the Borrower as RCA may deem proper which modify or
otherwise alter the terms of any of the obligations of the Borrower
to RCA and that such modifications or alterations shall not in any
way impair or affect the validity or enforceability of this
Agreement. Provided, however, that RCA's Credit Facility shall
not exceed the following formula based lending limits: (a)

11

Equipment Credit Facility: (i) RCA's loans for the purchase of new or used machinery and equipment shall not exceed the Ninety percent (90%) of the equipment's cost; and (ii) RCA's loans on existing machinery and equipment shall not exceed One Hundred percent (100%) of the "Ninety (90) day liquidation value" as determined by an MAI appraiser selected by RCA; (b) Debt Secured by Real Estate. RCA's loans that are secured by mortgages shall not exceed the greater of One Hundred percent (100%) of the real property appraisal value or the purchase price; and (c) Revolving Credit Facility; (i) RCA's accounts receivable lending shall not exceed ninety percent (90%) of accounts receivable excluding accounts that exceed Ninety (90) days if recognized as eligible by RCA, and (ii) inventory lending shall not exceed Fifty percent (50%) of inventory if recognized as eligible by RCA.

3.    No waiver shall be deemed to be made by RCA of any of its rights hereunder unless the same shall be in writing signed on behalf of RCA, and each such waiver, if any shall be a waiver only with respect to the specific matter or matters to which the waiver relates and shall in no way impair the rights of RCA or the obligations of the Borrower to RCA on any other respect at any other time.

4.    The subordination by LENDER made in this Subordination Agreement, and the rights and privileges of RCA hereunder, shall continue for as long as RCA has a security interest in the Equipment and until all obligations of Borrower to RCA now existing or incurred hereafter are satisfied in full.

5.    This Agreement shall be binding upon and inure to the benefit of LENDER and RCA and their respective heir, executors, administrators, successors and assigns.

6.    LENDER agrees to execute any documents necessary to subordinate its security interest in the Equipment to RCA's Interest.

7.    **This Agreement shall be governed by and construed as to each item of Equipment in accordance with the laws of the State of New Jersey and the parties hereby submit to the venue and jurisdiction of Bergen County, New Jersey to resolve any disputes arising hereunder or in connection herewith.**

8.     Nothing herein shall be deemed in any way to modify the obligations of Borrower either to RCA or LENDER or to limit the rights of RCA as against the Borrower.

26.     The Final Draft differs from the Larsen Draft as follows:

1.     In order to induce RCA to make extensions of credit to Borrower, the repayment of which is to be secured by RCA's Interest in the Equipment, LENDER hereby subordinates the lien of LENDER's security interest to the lien of RCA's Interest (now or hereafter held by RCA) in the Equipment ~~provided that RCA's Interest does not exceed the following RCA Lending Limits: (a) RCA's Loans for the purchase of new or used machinery and equipment shall not exceed the One Hundred percent (100%) of the equipment's cost; and (b) RCA's Loans on existing machinery and equipment shall not exceed One Hundred percent (100%) of the ninety (90) day liquidation value as determined by an MAI appraiser selected by Senior Lender.~~ <u>LENDER will not enforce or exercise its rights in the Equipment and will not ask, demand, sue for, take or receive from Borrower any interest in the Equipment unless and until all obligations of Borrower to RCA now existing or hereafter created, the repayment of which are secured by RCA's Interest in the Equipment, are satisfied in full.</u>

~~2.     In the event that RCA's Interest in the Equipment exceeds the RCA Lending Limits, then RCA's Interest shall be subordinate to LENDER's security interest in the Equipment for those amounts that exceed the RCA Lending Limits.~~

2.     LENDER agrees and acknowledges that RCA, at any time and from time to time, may enter into such agreements with the Borrower as RCA may deem proper which modify or otherwise alter the terms of any of the obligations of the Borrower to RCA and that such modifications or alterations shall not in any way impair or affect the validity or enforceability of this Agreement. <u>Provided, however, that RCA's Credit Facility shall not exceed the following formula based lending limits: (a) Equipment Credit Facility: (i) RCA's loans for the purchase of new or used machinery and equipment shall not exceed the *Ninety percent (90%)* of the equipment's cost; and (ii) RCA's loans on existing machinery and equipment shall not exceed One Hundred percent (100%) of the "Ninety (90) day liquidation value" as determined by an MAI appraiser selected by RCA;</u> *(b) Debt Secured by Real Estate. RCA's loans that are secured by*

13

*mortgages shall not exceed the greater of One Hundred percent (1OO%) of the real property's appraisal value or the purchase price; and (c) Revolving Credit Facility; (i) RCA's accounts receivable lending shall not exceed ninety percent (90%) of accounts receivable excluding accounts that exceed Ninety (90) days if recognized as eligible by RCA, and (ii) inventory lending shall not exceed Fifty percent (50%) of inventory recognized as eligible by RCA.*

<u>3.</u>    No waiver shall be deemed to be made by RCA of any of its rights hereunder unless the same shall be in writing signed on behalf of RCA, and each such waiver, if any shall be a waiver only with respect to the specific matter or matters to which the waiver relates and shall in no way impair the rights of RCA or the obligations of the Borrower to RCA on any other respect at any other time.

<u>4.</u>    The subordination by LENDER made in this Subordination Agreement, and the rights and privileges of RCA hereunder, shall continue for as long as RCA has a security interest in the Equipment and until all obligations of Borrower to RCA now existing or incurred hereafter are satisfied in full.

<u>5.</u>    This Agreement shall be binding upon and inure to the benefit of LENDER and RCA and their respective heir, executors, administrators, successors and assigns.

<u>6.</u>    LENDER agrees to execute any documents necessary to subordinate its security interest in the Equipment to RCA's Interest.

<u>7.</u>    **This Agreement shall be governed by and construed as to each item of Equipment in accordance with the laws of the State of New Jersey and the parties hereby submit to the venue and jurisdiction of Bergen County, New Jersey to resolve any disputes arising hereunder or in connection herewith.**

<u>8.</u>    Nothing herein shall be deemed in any way to modify the obligations of Borrower either to RCA or LENDER or to limit the rights of RCA as against the Borrower.

~~**LENDER'S SUBORDINATION**. Absent the existence of a Payment Default, upon written notification to Lender, Lender shall~~

14

execute documents necessary to subordinate its security interest in all real and personal property pledged as collateral under this Agreement to the security interests of Borrower's credit facility provider ("Senior Lender(s)"). Provided, however, the credit facilities provided by Senior Lender to Borrower shall not exceed the following lending limits: (a) Revolving Credit Facility: (i) accounts receivable lending shall not exceed Ninety percent (90%) of Borrower's accounts receivable excluding accounts that exceed Ninety (90) days if recognized as eligible by Senior Lender; and (ii) inventory lending shall not exceed Fifty percent (50%) of Borrower's inventory if recognized as eligible by Senior Lender; (b) Equipment Credit Facility: (i) Senior Lender's loans for the purchase of new or used machinery and equipment shall not exceed the Ninety percent (90%) of the equipment's cost; and (ii) Senior Lender's loans on existing machinery and equipment shall not exceed One Hundred percent (100%) of the "Ninety (90) day liquidation value" as determined by an MAI appraiser selected by Senior Lender; (c) Debt Secured by Real Estate: Senior Lender's loans that are secured by mortgages shall not exceed Ninety percent (90%) of the real property's appraised value.

**ADDITIONAL PROVISION**. Lender and Mortgagee mutually agree that:

1. Mortgagee will subordinate its interests in the Subordinated Mortgage to Lender's Superior Indebtedness and all other fees or expenses ("Lender Claims") that do not exceed the aggregate total of One Million Seven Hundred Thousand and no/100 Dollars ($1,700,000.00) ("Subordinated Amount"). Lender Claims in excess of the Mortgagee's Subordinated Amount shall be subordinate to any amounts owed to Mortgagee by Borrower in accord with the terms of the Loan Agreement Amendment made the 15th day of February, 2002, between CMCHB, Inc., a Michigan corporation """hose address is 120 Lincoln, Ontonagon, Michigan 49953 ("Debtor") and the State of Michigan located at 300 North Washington Square, Lansing, Michigan 48913 ("Creditor").

2. Mortgagee's rights to payments from Borrower shall be suspended only after Lender has provided written notice to Mortgagee that Lender has declared a payment default by Borrower and has initiated formal foreclosure proceedings in Michigan against all of the Borrower's real and personal property.

3. In the event that there is any conflict between the

15

~~terms of this Additional Provision paragraph and the terms in any~~
~~other paragraph of this Subordination of Mortgage agreement, then~~
~~the terms of this Additional Provision paragraph shall prevail.~~

27. The Final Draft was reviewed by Larsen and legal counsel for the MEDC. After MEDC and its counsel determined that the Final Draft was acceptable, the Final Draft was forwarded to Cheboygan with instructions to execute the Final Draft and send an original executed Final Draft to RCA, which is referred to as the "First Subordination Agreement".

28. The First Subordination Agreement and the Second Subordination Agreement contain substantially identical terms and do not contain any material differences other than the dates and the Schedule of Collateral annexed thereto.

### D.    The Purchase Money Security Agreement

29. There is an issue of fact as to whether All Points holds a purchase money security interest in the PremiAir Equipment. There have been no proofs or stipulations with regard to payment for the PremiAir Equipment out of the proceeds of the 10058 Loan.

30. The issue of whether All Points holds a purchase money security interest in the PremiAir Equipment is not presently an issue ripe for consideration on summary judgment.

The parties attached the following additional exhibits to the Supplemental Stipulation:

(1)    The Court's July 1, 2010, Opinion and Order Denying the Cross-Motions for Summary Judgment;
(2)    The Affidavit of Nancy Eddy;
(3)    The Affidavit of Scott McNeil;
(4)    The Affidavit of Hans Larsen;
(5)    The deposition transcript of Hans Larsen;

16

(6)     The deposition transcript of Catherine Wilinski;
(7)     The First Draft of the Subordination Agreement;
(8)     A copy of December 2004,  "email string" between Hans Larsen and Steve Cubellis;
(9)     The "Larsen Draft" of the Subordination Agreement

As stated by the parties in the Supplemental Stipulation, the Court conducted status conferences following its July 1, 2010, Opinion and Order, on July 9, 2010, October 15, 2010, and October 22, 2010.  Oral argument thereafter took place on December 3, 2010, following the parties' filing of the Supplemental Stipulation.  In the Supplemental Stipulation at Paragraph 7, the parties characterize the issues before the Court as a request for this Court "to reconsider" its July 1, 2010, decision.

The parties have expended considerable resources to develop and bolster their respective positions.  From the numerous conferences and hearings, it is clear the parties prefer to present their case on motion, as opposed to a trial.  While a few discrete issues remain for trial, the Court respects the parties' desire to have a decision with this record, that is on brief and argument, and not trial.

The Court has reviewed all pleadings in this matter, and for the reasons stated below, determines that All Points' lien has priority under the Second Subordination Agreement.

<u>Jurisdiction</u>

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(K) (determinations of the validity, extent, or priority of liens).  Both All Points and Cheboygan consent to the Court's exercise of jurisdiction of this adversary proceeding.

<u>Law</u>

17

A. <u>Controlling Law</u>

First, as a preliminary matter, the Court notes that there is no dispute that pursuant to Paragraph 7 of the Second Subordination Agreement, it is "governed by and construed as to each item of Equipment in accordance with the laws of the State of New Jersey," *See also* Restatement (Third) of Conflict of Laws § 187 (1971). The Court will, accordingly, refer to and rely upon New Jersey law when analyzing it.

B. <u>Burden of Proof</u>

While the burden of proof normally rests with the Plaintiff who is seeking relief with the Court, *Schaffer v. West*, 546 U.S. 49, 56, 126 S. Ct. 528, 163 L.Ed.2d 387 (2005), this case is unusual in that the Court views both All Points and Cheboygan as seeking the same determination from the Court. That determination is who has the priority lien in the disputed collateral, which in the Court's view, places the parties on equal footing for purposes of which has the burden of proof and persuasion in this action. All Points was selected as the Plaintiff randomly at the end of a hearing; Cheboygan could have just as easily been the selected Plaintiff. The Court will not, therefore, assign the usual burden of proof on All Points.

C. <u>General Law of Contract Interpretation</u>

The well-settled law of contract interpretation requires the court to examine the plain language of the contract at issue. If the contract language is clear, interpretation is unnecessary, and the court must enforce the contract according the terms as written. *Schor v. FMS Fin. Corp.*, 357 N.J. Super. 185, 191, 814 A.2d 1108, 1112 (2002) (citations omitted). A "court should examine the document as a whole and the 'court should not torture the language of [a contract] to

18

create ambiguity.'" *Id*. (quoting *Stiefel v. Bayly, Martin & Fay, Inc.*, 242 N.J. Super. 643, 651, 577 A.2d 1301 (App. Div. 1990)). A party's alleged "secret intention" cannot supersede the intention "outwardly manifested" in the unambiguous language of the contract. *Id*. (citations omitted).

If, however, the Court determines that the contract terms are "susceptible to at least two reasonable alternative interpretations," an ambiguity exists, which requires the Court to look to extrinsic evidence to determine the intent of the parties. *Id*. If an ambiguity does exist, such is to be strictly construed against the party preparing it. *City of Orange Twp. v. Empire Mortg. Servs., Inc.*, 341 N.J. Super. 216, 227, 775 A.2d 174, 181 (App. Div. 2001) (citations omitted).

D. <u>General Law on Assignability of Contracts</u>

Contracts rights are generally freely assignable, but this general rule does have exceptions. If the contract contains express language prohibiting the power of assignment, courts will generally uphold and enforce such. *Somerset Orthopedic Assocs., P.A., v. Horizon Blue Cross and Blue Shield of New Jersey*, 345 N.J.Super. 410, 785 A.2d 457 (2001) (citations omitted). Additionally, courts must also be satisfied that there is no public policy reason that would prohibit the assignment. *See Aronsohn v. Mandara*, 98 N.J. 92, 484 A.2d 675, 679 (1984) (citing 4 *Corbin on Contracts* § 857, at 410; § 872, at 485-86; § 873, at 494 (1951)). As to exceptions to the assignability of contract rights, New Jersey courts have adopted the standard found in the Restatement (Second) of Contracts:

(2) A contractual right can be assigned unless

(a) the substitution of a right of the assignee for the right of the assignor would materially change the duty of the obligor, or materially increase the burden or risk imposed on him by his contract, or materially impair his chance of obtaining return performance, or material reduce its value to him, or

      (b) the assignment is forbidden by statute or is otherwise inoperative on grounds of public policy, or

(c) assignment is validly precluded by contract.

*Somerset*, 785 A.2d at 461-62 (citing *Owen v. CNA Ins./Continental Cas. Co.*, 167 N.J. 450, 771 A.2d 1208, 1218 (2001); Restatement (Second) of Contracts, § 317 (1981)).   The use of language in a contract binding "heirs," "successors," or "assigns" supports a conclusion that the parties to a contract intended it be assignable. *See Randall v. Travelers Cas. & Sur. Co.*, 145 P.3d 1048, 1054 (Okla. 2006) (citing Oklahoma law).  Courts have recognized that an otherwise unassignable contract may be made assignable by the insertion of such language.  *See K N Gas Supply Servs., Inc. v. American Prod. Partnership-V, Ltd.*, 994 F. Supp. 1283, 1286 (D. Colo. 1998) (citing Colorado law).

<u>Analysis</u>

A . <u>Interpretation of the Second Subordination Agreement</u>

      1. <u>The Second Subordination Agreement Is Not Ambiguous As To RCA's Ability to Assign</u>

      Paragraph 5 of the Second Subordination Agreement states:

      This Agreement shall be binding upon and inure to the benefit of [Cheboygan] and RCA and their respective heir, executors, administrators, successors and assigns.

      The Second Subordination Agreement does not contain an express or implied prohibition on assignments.  There is no other part of this agreement that addresses the concept of assignment or the ability to assign.  The Court is in effect being asked by the parties to go beyond the four corners of the Second Subordination Agreement to make this determination, while at the same time both parties continue to assert that the agreement is not ambiguous and

20

that their respective interpretation is the correct one. Both sides have spent considerable time and effort formulating stipulated facts and engaging in discovery in an attempt to support their positions. Specifically, both All Points and Cheboygan present different versions of their understanding regarding the ability of RCA to assign its rights under either subordination agreement. On one hand, while Cheboygan disputes the validity of the assignment of the First Subordination Agreement, it appears to the Court that Cheboygan became aware of the assignment from RCA to All Points when the Second Subordination Agreement was executed. The fact that Cheboygan was aware of and acquiesced in the first assignment, albeit after the fact, supports a finding that the Second Subordination Agreement was validly assigned to All Points as well.

This ambiguity analysis has been further complicated by the Court's inquiry into the identity of the drafter of this document–RCA, as assignor to All Points, or Cheboygan. The Court notes that as a general rule of contract construction, an agreement, such as the Second Subordination Agreement, is to be construed against the drafter. *See Pacifico v. Pacifico*, 190 N.J. 258, 267, 920 A.2d 73 (2007) (citing 5 *Corbin on Contracts* § 24.27 (Perillo ed., rev. ed. 1998)). The briefs address this issue, and argue first that the Second Subordination Agreement is unambiguous and, thus, the identity of the drafter is irrelevant; and, second, because the agreement was the product of extensive negotiations between RCA and Cheboygan, this doctrine of *contra proferentem* does not apply and, thus this rule of construing the contract term against the drafter, is inapplicable.

2. Review of Affidavits and Deposition Testimony to Refute Ambiguity

As noted above, the Court has reviewed and analyzed the affidavits of Nancy Eddy, Scott

McNeil and Hans Larsen, as well as the deposition transcripts of Hans Larsen and Catherine Wilinski. Nancy Eddy is an employee of the State of Michigan, Michigan Economic Development Corporation, and Scott McNeil is the City Manager for the City of Cheboygan. Both testified in their respective capacities and in their personal knowledge that neither they, or their employers consented to, or were aware of the subject assignment from RCA to All Points under the Second Subordination Agreement. The Court concludes that the knowledge of these individuals is irrelevant for purposes of determining whether the assignment was valid under the above-cited law, as such knowledge and/or consent is not required.

The affidavit of Hans Larson, as well as the transcript of his April 8, 2010, deposition were reviewed for purposes of the Court's July 1, 2010 Opinion and Order on the Cross-Motions for Summary Judgment. The Court's Opinion regarding what conclusions may be drawn from Mr. Larsen's testimony has not changed. For the reasons stated in that Opinion, the Court continues to find that it is not clear who drafted the Second Subordination Agreement and whether such was the product of extensive negotiations between the parties, rendering the effect of such meaningless for purposes analyzing whether it was properly assigned to All Points by RCA. The Court concludes that there is no practical effect of this finding as it has determined that the Second Subordination Agreement is unambiguous. The Court also notes that Mr. Larsen's testimony offers no further guidance in this regard.

The Court has also reviewed the deposition testimony of Catherine Wilinski. Ms. Wilinski is a senior vice president in the asset recovery division for All Points, and one of her duties involved collection of amounts due from the Debtor under the subject contracts and under its rights pursuant to the Second Subordination Agreement and subsequent assignment from

22

RCA to All Points. It is clear to the Court that Ms. Wilinski was involved with the loans at issue at the collection stage, long after the Second Subordination Agreement and the assignment at issue were executed. Ms. Wilinski answered questions as to the extent of her knowledge concerning these documents, both directly and indirectly, with inconclusive results.

After having reviewed the parties' extensive offers of proof, both in their stipulated facts and attendant exhibits and as described above, the Court comes back to the quoted language of Paragraph 5 of the Second Subordination Agreement:

> This Agreement shall be binding upon and inure to the benefit of [Cheboygan] and RCA and their respective heir, executors, administrators, successors and assigns.

The Court concludes that the above-quoted language is unambiguous and not subject to more than one interpretation. As with most contracts, the Second Subordination Agreement was freely assignable. There is no express prohibition on assignments contained therein, nor did the parties offer, nor could the Court find, a statutory or public policy prohibition of such an assignment.

B. <u>Whether Second Subordination Agreement Was Otherwise Validly Assigned</u>

During several points throughout these proceedings, Cheboygan has asserted that All Points only assumed the rights and not the obligations of RCA under the assignment, negating the validity of the assignment. First, the Court views the issue before it as whether RCA had the ability to assign its rights under the Second Subordination Agreement. The Court has concluded it clearly did have the ability. If, however, Cheboygan is indeed asking this Court to go further and determine whether other terms of the Second Subordination Agreement somehow negate the validity of the assignment the only allegation from Cheboygan the Court could find on this point was its assertion that under Paragraph 4 of the Second Subordination Agreement, the

subordination by Cheboygan only continued "for as long as RCA has a security interest in the collateral." Cheboygan's argument is that because RCA's security interest terminated under the assignment, the attendant subordination terminated as well. The Court concludes that it is implied that the security interest, and the attendant subordination, continued for its assignee, All Points. There is no other possible reasonable interpretation of the interplay of these two paragraphs.

C. <u>All Points' Compliance with Terms of Second Subordination Agreement</u>

Cheboygan has also asserted that All Points has not complied with the terms of the Second Subordination Agreement. As noted in its July 1, 2010, Opinion, issues of fact remain as to what All Points' obligations specifically were and the extent of its compliance with its obligations under the Second Subordination Agreement. The Court cannot conclude based upon the record before it that All Points has not complied with any particular condition.

D. <u>PremiAir Equipment</u>

The parties agree at Paragraphs 29 and 30 of the Supplemental Stipulation that issues of fact remain as to whether All Points holds a purchase money security interest in the PremiAir Equipment, and payment for such out of the proceeds of the 10058 Loan. Thus, upon a written motion, the Court will set a hearing on this discrete issue.

Conclusion

For the reasons stated above, the Court determines that All Points holds a priority lien position with regard to the Disputed Collateral.

Counsel for All Points is directed to prepare an Order consistent with the Opinion of the Court.

24

Signed on March 28, 2011

                              _____/s/ Daniel S. Opperman_____
                                  Daniel S. Opperman
                                  United States Bankruptcy Judge